IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J.C. TRADING LIMITED,<br>    Plaintiff, | :<br>:<br>: |
| v. | :    Civil Action No. 11-421-RGA |
| WAL-MART STORES, INC.<br>    Defendant. | :<br>:<br>: |

David H. Luce, Esq. (argued), CARMODY MACDONALD P.C., St. Louis, MO; Thomas F. Driscoll III, Esq., BIFFERATO LLC, Wilmington, DE, Attorneys for Plaintiff.

Laura L. Chapman (argued), SHEPPARD, MULLIN, RICHTER & HAMPTON LLC, San Francisco, CA; Gregory B. Williams (argued), FOX ROTHSCHILD LLP, Wilmington, DE, Attorneys for Defendant.

MEMORANDUM OPINION

May 31, 2013

*[signature]*
ANDREWS, U.S. DISTRICT JUDGE:

J.C. Trading initiated this action in Missouri state court on October 1, 2010, alleging nine causes of action relating to the breach of three purported oral agreements. Walmart removed the case to the U.S. District Court for the Eastern District of Missouri on March 4, 2011. (D.I. 1). On May 12, 2011, Eastern District of Missouri Judge Catherine D. Perry transferred the case to this Court, finding that venue was not proper in Missouri based on the Delaware choice of law provision in the Supplier Agreements. (D.I. 30). Walmart filed the instant motion for summary judgment on January 17, 2013. (D.I. 93). The motion is fully briefed (D.I. 94, 99, 110) and oral argument was held on April 24, 2013. For the reasons that follow, the Court will grant Walmart's motion for summary judgment as to all counts.

## I. BACKGROUND

Walmart sold a style of athletic footwear called the "Johnny" (for men) and the "Joanie" (for women) before and during 2008. Walmart purchased those shoes from third-party suppliers. In mid-2008, Walmart considered contracting with a new supplier to supply a portion of its "Johnny" inventory and contacted J.C. Trading. J.C. Trading is a corporation that designs and exports a variety of footwear products, including athletic shoes. (D.I. 100, Ex. A at 21:7-25:24); *id.*, Ex. B at ¶ 2). Roy Giliotti, a men's footwear buyer at Walmart, and Gary Gorsuch, the president of J.C. Trading, met in June 2008 to discuss a possible business relationship. (D.I. 96, Ex. 3 at 50:17-51:24). Giliotti asked Gorsuch to design and develop a revamped Johnny shoe and to determine the cost to manufacture. (D.I. 100, Ex. A at 50:17-24; *id.*, Ex. E at 33:3-15). J.C. Trading started working on a redesign for Walmart's consideration.

J.C. Trading and Walmart entered into a written Supplier Agreement on August 19, 2008

1

and an identical Supplier Agreement on September 1, 2009, after the first one expired. (D.I. 96, Exs. 1 and 2). J.C. Trading has admitted that it entered into the Supplier Agreements in 2008 and 2009. (D.I. 119 at 4).

The Supplier Agreements govern the terms and conditions of the sale to Walmart of merchandise supplied by J.C. Trading. Four provisions in the Supplier Agreements are particularly relevant: First, the preamble of the Agreements expressly provides that "[t]he execution and submission of this Agreement does not impose upon [Walmart] any obligation to purchase Merchandise." (D.I. 96, Exs. 1-2 at preamble). "Merchandise" is defined in the Supplier Agreements as "all products, goods, materials, equipment, articles, and tangible items supplied by [J.C. Trading] to [Walmart]." (*Id.* at ¶1(c)).

Second, the Order Clause provides that "[o]nly the issuance of an Order creates an obligation upon [Walmart]." (*Id.* at ¶2(f)). "Order" is defined in the Supplier Agreements as "any written or electronic purchase order issued by [Walmart]." (*Id.* at ¶ 1(e)). The Order Clause further provides that "[p]rojections, past purchasing history and representations about quantities to be purchased are not binding, and [Walmart] shall not be liable for any act or expenditure . . . by [J.C. Trading] in reliance on them." (*Id.* at ¶ 2(f)).

Third, the Design Clause provides that:

> Any confidential information, knowledge, designs . . . by [J.C. Trading] which [J.C. Trading discloses to Walmart] . . . unless otherwise specifically agreed to in writing by [Walmart] . . . shall be acquired by Walmart [free] from any restrictions . . . as part of the consideration for this [agreement]. No cause of action will arise on [J.C. Trading's] behalf for [Walmart's] use of any confidential information disclosed to [Walmart] and no damages whatsoever shall accrue.

2

(*Id.* at ¶ 16).

Fourth, the Integration Clause provides that:

> The parties hereto agree that this Agreement and any Order constitute the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement. All prior agreements, negotiations, dealings and understandings, whether written (including any electronic records) or oral, regarding the subject matter hereof, are superseded by this Agreement. Any changes in this Agreement shall be in writing and executed by both parties.

(*Id.* at ¶ 34).

## II. LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "could affect the outcome" of the proceeding. *See Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Matsushita*, 475 U.S. at 587. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment. *Anderson*, 477

3

U.S. at 249. Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. Count I - Breach of the Johnny Agreement

J.C. Trading alleges that it entered into an agreement with Walmart in which Walmart agreed to buy 3 million pairs of white Johnny shoes for $5.10/pair (the "Johnny Agreement"). (D.I. 7 at ¶¶ 22, 43). J.C. Trading further alleges that Walmart breached the Johnny Agreement by failing to purchase any white Johnny shoes between August 2008 and September 1, 2010. (*Id.* at ¶ 45). Walmart argues that J.C. Trading's claim for breach of contract with respect to the Johnny Agreement fails because it is barred by the Integration Clause, which provides that "[a]ny changes in this Agreement shall be in writing and executed by both parties." (D.I. 100, Ex. 1 at ¶ 34). In response, J.C. Trading argues that the Johnny Agreement is not a modification to the Supplier Agreement but, rather, independent of it. J.C. Trading further asserts that, even if the Johnny Agreement is considered a modification to the Supplier Agreement, it is in writing and, therefore, not barred by the Integration Clause. (D.I. 99 at 13).

J.C. Trading, however, does not explain how the Johnny Agreement is independent of the Supplier Agreement, which governs the sale of all merchandise by J.C. Trading to Walmart. (*Id.*). Assuming the parties entered into the Johnny Agreement, it must be considered a modification of the Supplier Agreement and J.C. Trading's claim fails unless the Johnny

4

Agreement is in writing and executed by both parties, as required by the Integration Clause.

J.C. Trading cites to a number of e-mails in support of its argument that the Johnny Agreement is in writing. (*See, e.g.*, D.I. 100, Exs. G-I, X-AA). These e-mails at most show that Gorsuch asked a number of times about the white Johnny shoe, but they do not show that an agreement had been reached for Walmart to purchase 3 million pairs of white Johnny shoes for $5.10 per pair. The e-mails are also not evidence from which one could conclude that Gorsuch believed Walmart was not living up to its end of an agreement. Nor do the e-mails show that Walmart believed it was committed to purchasing any white Johnny shoes from J.C. Trading. Accordingly, the Court concludes that J.C. Trading has not produced sufficient evidence from which a reasonable juror could conclude that J.C. Trading and Walmart entered into a written Johnny Agreement sufficient to meet the requirements of the Integration Clause.

J.C. Trading argues in the alternative that, even if the Johnny Agreement was not in writing, that the "no oral modification" provision in the Integration Clause can itself be modified orally or by the course of their conduct. *See J.A. Constr. Co. v. Sussex Assocs. Ltd. P'ship*, 688 F. Supp. 982, 988 (D. Del. 1998) (A "no oral modification clause in a written contract 'may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by the course of conduct of the parties.'" (quoting *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico*, 297 A.2d 28, 33 (Del. 1972)). Here, there has been no oral modification or waiver of the "no oral modification" provision of the Integration Clause because Walmart did not express an intent to modify the terms of the Supplier Agreement. Nor has there been a modification by the parties' conduct because Walmart's actions did not modify the Order Clause, which expressly provides

5

that "representations about quantities to be purchased are not binding." (D.I. 96, Exs. 1-2 at ¶2(f)). Walmart did not engage in any course of conduct inconsistent with the Supply Agreements.[1]

The statute of frauds also bars J.C. Trading's claim for breach of the Johnny Agreement. The statute of frauds provides:

> Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

6 Del. C. § 2-201(1); *see also Kirkwood Motors, Inc. v. Conomon*, 2001 WL 112054, at *2 (Del. Super. Feb. 5, 2001). J.C. Trading argues that the "grumbling acceptance" exception to the statute of frauds applies here. The "grumbling acceptance" exception provides that:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of [the statute of frauds] against such party unless written notice of objection to its contents is given within ten days after it is received.

6 Del. C. § 2-201(2). The e-mails on which J.C. Trading relies, however, do not constitute a written confirmation of any agreement to purchase any specific quantity of merchandise of any particular color. (D.I. 101, Exs. X-AA). These e-mails, therefore, do not meet the "grumbling acceptance" exception to the statute of frauds.

---

[1] At oral argument, J.C. Trading agreed that there were no disputes that Walmart had lived up to its contractual obligations when it issued purchase orders for shoes. Further, there is no allegation that Walmart ever purchased any shoes without a purchase order. J.C. Trading is not too specific about the "course of conduct" upon which it is relying. Negotiations are not a "course of conduct."

6

Accordingly, the Court will grant Walmart's motion for summary judgment as to Count I for breach of the Johnny Agreement.

### B. Count II - Breach of the Design Agreement

J.C. Trading asserts that it entered into an agreement with Walmart to allow one of Walmart's other vendors to use J.C. Trading's design of the Johnny shoe on the condition that Walmart would purchase substantial quantities of the white Johnny shoe (the "Design Agreement"). (D.I. 7 at ¶26, 48). J.C. Trading further asserts that Walmart breached the Design Agreement by failing to purchase any white Johnny shoes between August 2008 and September 1, 2010. (*Id.* at ¶ 50). Walmart argues that J.C. Trading's claim for breach of the Design Agreement fails because it is barred by the Integration Clause. As with the Johnny Agreement, J.C. Trading argues that the Design Agreement is not a modification of the Supplier Agreement but, rather, independent of it.

J.C. Trading, however, does not explain how the Design Agreement is independent of the Supplier Agreements.[2] The Supplier Agreements provide that designs disclosed by J.C. Trading to Walmart become Walmart's property as consideration for the Supplier Agreements. (D.I. 96, Exs. 1-2 at ¶ 16). The only way the Design Agreement could be "independent" of the Supplier Agreements would be if it was in writing and executed by both parties. It was not. The e-mails to which J.C. Trading cites do not constitute written modification of the Supplier Agreement. (*See* D.I. 100, Exs. K-M). The e-mails are mostly e-mails from J.C. Trading and do not contain

---

[2] The only thing J.C. Trading cites is the intellectual property provision of the Supplier Agreements (D.I. 96, Exs.1-2 at ¶ 16), which requires certain matters be "specifically agreed to in writing." When J.C. Trading quotes the provision, it only quotes the "agreed to" portion of the relevant language. (D.I. 99 at 13).

7

any acceptance by Walmart of any offer by J.C. Trading. The e-mails also do not specify the color of the product Walmart would order. It is undisputed that Walmart purchased over 1.5 million pairs of Johnny shoes from J.C. Trading. J.C. Trading has not presented any evidence or argument that this amount is insubstantial.[3]

J.C. Trading's claim for breach of the Design Agreement is also insufficient because the Design Agreement fails for lack of consideration. The Supply Agreements provide that Walmart acquired J.C. Trading's designs "as part of the consideration" for entering into the Supplier Agreements. (D.I. 96, Exs. 1-2 at ¶16). Consideration given for a prior agreement cannot support a new contract. *See Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000) ("Past consideration, as opposed to true consideration, however, cannot form the basis for a binding contract."). Walmart's right to acquire J.C. Trading's design, therefore, cannot be consideration for the alleged Design Agreement because Walmart already had the right to acquire those designs pursuant to the Supplier Agreements.

Accordingly, the Court will grant Walmart's motion for summary judgment as to Count II for breach of the Design Agreement.

### C. Counts III and IV – Breach of the Joanie Agreement and Action to Enforce Settlement Agreement

---

[3] J.C. Trading's claim for breach of the Design Agreement also fails because "substantial quantities" is fatally indefinite. An indefinite quantities contract is illusory and, therefore, unenforceable. *See XO Commc'ns, LLC v. Level 3 Commc'ns, Inc.*, 948 A.2d 1111, 1123 n.56 (Del. Ch. 2007) (citation omitted). Even assuming, however, that a contract for Walmart to purchase "substantial quantities" of shoes was enforceable, the Court concludes that no reasonable jury could find that 1.5 million pairs of shoes did not constitute a "substantial" quantity.

8

J.C. Trading asserts that Walmart entered into the Joanie Agreement to settle the parties' dispute regarding purchases of the Johnny shoe and that Walmart breached the agreement by failing to purchase any Joanie shoes. (D.I. 7 at ¶¶ 53-54).[4] J.C. Trading cites to three e-mails as evidence that Walmart entered into the Joanie Agreement and that the agreement was made in writing. On June 22, 2010, Richard Durant, a senior manager for Walmart, e-mailed a proposal to Gorsuch and stated, "Gary, after confirmed agreement from you and JC Trading on the above, a legal document [will be] drafted and authorized by a Walmart officer and delivered to JC Trading for signature." (Ex. 100, Ex. EE). On June 28, 2010, Gorsuch wrote to Durant: "We would like to have a written agreement by week['s] end to allow the factories to be able to proceed with their first two months material preparation." (Ex. 100, Ex. DD). Gorsuch's e-mail clearly indicates that, as of June 28, 2010, no final, written agreement had been reached and also indicates Gorsuch's understanding, consistent with Durant's June 22, 2010 e-mail, that Walmart required a legal document authorized by one of its officers and signed by J.C. Trading.

Gorsuch accepted the terms of Durant's proposal on June 29, 2010. (D.I. 100, Ex. EE). Later e-mails, however, confirm that Gorsuch's acceptance of Durant's proposal merely memorialized the ongoing business negotiations of the parties and that a final, written agreement had not been reached. Durant wrote to Gorsuch on July 12, 2010 and stated, "All information

---

[4] In its amended complaint, J.C. Trading asserted Count III for breach of contract and Count IV to enforce a settlement agreement. (D.I. 7). Counts III and IV are duplicative of each other and do not state separate claims as they each relate to the Joanie Agreement.
  J.C. Trading argues that the Joanie Agreement is independent of the Supplier Agreements. (D.I. 99 at 13). The argument is that settlement agreements are independent of any underlying contracts. No pertinent authority is cited for this proposition. If the agreement is "independent," then it does not have to be in writing. This argument makes little sense here where the purported settlement agreement is a further contract to do exactly the sort of business envisioned by the Supplier Agreements.

9

has been discussed internally and I am just waiting for Legal to 'legalize' the verbiage and give the go ahead." (*Id.*, Ex. FF). Gorsuch responded on July 15, 2010: "While I want to reach a [fair] and amicable solution, if we [cannot] finalize by the end of next week, I will step out of the discussion and let 3rd parties handle." (*Id.*). J.C. Trading has set forth no evidence that Walmart and J.C. Trading ever finalized any purported agreement as to the Joanie shoe, in writing or otherwise.[5]

Accordingly, the Court will grant Walmart's motion for summary judgment as to Counts III and IV for breach of the Joanie Agreement and to enforce the settlement agreement.

### D. Count V - Promissory Estoppel

Promissory estoppel "is an equitable remedy designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." *Weiss v. Northwest Broad., Inc.*, 140 F. Supp. 2d 336, 344-45 (D. Del. 2001) (internal quotations and citation omitted). A promissory estoppel claim requires "that defendant made a promise with intent to induce action or forbearance, that plaintiff actually relied on the promise, and that he suffered injury as a result." *See VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 87 (Del. 1998). A "party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract." *Weiss*, 140 F. Supp. 2d at 345.

---

[5] The Court notes that J.C. Trading's litigation in this Court belies the claim that a final agreement was reached. The agreement as set forth in the amended complaint (D.I. 7, ¶ 53) is that Walmart agreed to purchase, and J.C. Trading agreed to manufacture, 3 million pairs of Joanie shoes at a price of $4.77 per pair. J.C. Trading's proposed second amended complaint describes the Joanie Agreement as an agreement whereby Walmart agreed to purchase, and J.C. Trading agreed to manufacture, 3 million pairs of Joanie shoes (plus or minus 20%) at a price of $4.66 per pair and Walmart agreed to purchase, and J.C. Trading agreed to manufacture, black Johnny shoes for the period October 2010 through January 2011. (D.I. 124, Ex. 4 at ¶ 53).

The Supplier Agreements cover the same subject matter as Walmart's alleged oral promises (*i.e.*, the sale of merchandise) and, thus, bar any claim of promissory estoppel. J.C. Trading argues that the Supplier Agreements do not bar its claim for promissory estoppel because Walmart's promises are in addition to its obligations under the Supplier Agreements. J.C. Trading cites to *Chrysler Corp. (Delaware) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024 (Del. 2003) for the proposition that the "contracts governing other aspects of the business relationship are of no consequence to this analysis because the promises made . . . were in addition to the existing relationship." *Id.* at 1033-34. J.C. Trading, however, has not cited to any evidence that the alleged promises were "in addition to its obligations under the [S]upplier [A]greements." (D.I. 99 at 17). Here, the Supplier Agreements applied to Walmart's purchase of all merchandise from J.C. Trading and, therefore, any purported agreements relating to the sale of shoes could not be independent of the Supplier Agreements.

Accordingly, the Court will grant Walmart's motion for summary judgment as to Count V for promissory estoppel.

### E. Count VI - Unjust Enrichment

A claim for unjust enrichment requires: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification ; and (5) the absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). Here, there is no impoverishment because Walmart had a right to acquire the Johnny redesign as consideration for entering into the Supplier Agreements. Moreover, there is no absence of remedy provided by law because the Supplier Agreements govern the relationship between J.C. Trading and Walmart.

J.C. Trading argues that Walmart benefitted by acquiring the rights to use J.C. Trading's design and J.C. Trading "suffered an impoverishment by spending thousands of dollars [c]reating a legally acceptable design, lining up factories, and by never receiving a single white Johnny order." (D.I. 99 at 17). J.C. Trading's argument, however, ignores that Walmart had a right to acquire the Johnny redesign under the Supplier Agreements. Moreover, the Supplier Agreements expressly provide that "[n]o cause of action will arise on [J.C. Trading's] behalf for [Walmart's] use of any confidential information disclosed to [Walmart] and no damages whatsoever shall accrue."

Accordingly, the Court will grant Walmart's motion for summary judgment as to Count VI for unjust enrichment.

### F. Count VII - Fraudulent Misrepresentation

A claim for fraudulent misrepresentation requires: (1) false representation (usually one of fact); (2) that defendant knew or believed the representation was false; (3) that the false representation was intended to induce the plaintiff to act or refrain from acting; (4) that the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) plaintiff was damaged by such reliance. *Carrow v. Arnold*, 2006 WL 3289582, at *8 (Del. Ch. Oct. 31, 2006), *aff'd*, 933 A.2d 1249 (Del. 2007). Under Delaware law, "sophisticated parties may not reasonably rely on representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations." *St. James Rec., LLC v. Rieger Opportunity Partners, LLC*, 2003 WL 22659875, at *3 (Del. Ch. Nov. 5, 2003) (internal quotations and citation omitted). The Supplier Agreements expressly provide that only a written purchase order obligates Walmart to purchase

merchandise from J.C. Trading. Thus, the Supplier Agreements bar any claim for fraudulent misrepresentation.

J.C. Trading's claim for fraudulent misrepresentation also fails because it cannot prove all the elements of this claim. There is no evidence of any "false representation." Walmart's alleged promise to purchase "substantial quantities" of Johnny shoes in the future was, at most, an oral statement of future intent. *See MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010) ("Generally, prior oral promises or statements of future intent do not constitute 'false representation[s] of fact' that would satisfy the first element of fraudulent misrepresentation."). J.C. Trading also cannot establish "justifiable reliance" because "[i]t is unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement." *See Carrow*, 2006 WL 3289582, at *8.

Accordingly, the Court will grant Walmart's motion for summary judgment as to Count VII for fraudulent misrepresentation.

### G.  Count VIII - Negligent Misrepresentation

A claim for negligent misrepresentation requires: (1) the existence of a pecuniary duty to provide accurate information; (2) the supplying of false information; (3) that the defendant failed to exercise reasonable care in obtaining or communicating the information; and (4) plaintiff suffered a pecuniary loss caused by reliance upon the false information. *Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 525 (D. Del. 2012). As with its claim for fraudulent misrepresentation, J.C. Trading's claim for negligent misrepresentation fails because it is barred by the Supplier Agreements. J.C. Trading also cannot prove the required elements of false information or reasonable reliance for the same reasons as discussed with

13

respect to its claim for fraudulent misrepresentation.

J.C. Trading's claim for negligent misrepresentation is also barred by the economic loss doctrine, which is "a judicially created doctrine that allows a party to recover in tort *only if* losses are accompanied by bodily harm or property damages" and not for losses that are "solely economic in nature." *Kuhn Constr. Co.*, 844 F. Supp. 2d at 526. Here, J.C. Trading is claiming only economic damages and has not alleged bodily harm or property damage. (*See* D.I. 7 at ¶ 94).

Accordingly, the Court will grant Walmart's motion for summary judgment as to Count VIII for negligent misrepresentation.

### H. Count IX - Conversion

J.C. Trading's claim for conversion fails. To state a claim for conversion, J.C. Trading must establish a property interest in the converted goods, the right to possess the goods, and damages. *See Hurst v. City of Dover*, 2008 WL 2421468, at *4 (D. Del. June 16, 2008). J.C. Trading cannot show a "property interest" in its Johnny shoe redesign because, pursuant to the Supplier Agreements, any design submitted to Walmart becomes Walmart's property as consideration for the Supplier Agreements. (D.I. 96, Exs. 1-2 at ¶ 16).

J.C. Trading's claim for conversion also fails because the redesign is not an "intangible good." Under Delaware law, a conversion claim cannot lie "for intangible property unless the property is 'intangible goods where the intangible property relations are merged into a document'" like a stock certificate. *Acierno v. Preit-Rubin Inc.*, 199 F.R.D. 157, 165 (D. Del. 2001); *accord, Brass Metal Prods. v. E-J Enters.*, 189 Md. App. 310, 340 (Md. Ct. Spec. App. 2009) (no conversion of intellectual property rights because it was not intangible property

14

merged into a document).

Accordingly, the Court will grant Walmart's motion for summary judgment as to Count IX for conversion.

## IV. CONCLUSION

For the reasons set forth above, Walmart's motion for summary judgment as to all counts is granted. A separate Order, consistent with this Memorandum Opinion, will be entered.